**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| **TYRONE REYNA,** ) | |
| ) | |
| **Plaintiff,** ) | |
| ) | |
| **v.** ) | **No.** |
| ) | |
| **CITY OF CHICAGO, KENNETH** ) | |
| **BOUDREAU, JOHN HALLORAN,** ) | |
| **R. MCGUIRE, ELLYN WEISS,** ) | |
| **GERRY CARROLL, JAMES O'BRIEN,** ) | |
| **BERNARD RYAN, M. PORCHODO,** ) | |
| **A. GORDON, FORMER ASSISTANT** ) | |
| **STATE'S ATTORNEY KAREN** ) | |
| **ARMBRUST, and COOK COUNTY** ) | |
| ) | |
| **Defendants.** ) | |

## COMPLAINT

Plaintiff, TYRONE REYNA (Tyrone), by his undersigned attorney, for his complaint against former Chicago Police Detectives Kenneth BOUDREAU, Star No. 20435; John HALLORAN, Star No. 20435; R. MCGUIRE, Star No. 20128; Ellyn WEISS, Star No. 20264; G. CARROLL, Star No. 20346; James O'BRIEN, Star No. 20446; Bernard RYAN, Star No. 20867; M. PORCHODO, Star No. 20246; Youth Officer Alberta GORDON, Star No. 4804; The CITY OF CHICAGO, former Assistant State's Attorney Karen ARMBRUST,  and COOK COUNTY, states the following:

## INTRODUCTION

1.      Plaintiff Tyrone Reyna spent 14 years incarcerated in the Illinois Department of Corrections for the 1993 murder of Hector Olaque – a crime he did not commit and had nothing to do with.

2.     In and around February 1993, the Defendants conspired among themselves and with others, known and unknown, to prosecute Plaintiff for the murder of Olaque while indifferent to the fact that he and his codefendants were innocent.

3.     The Defendant Officers' motive to frame was nothing other than a desire to close cases.

4.     Defendant Armbrust, a felony review assistant Cook County State's Attorney, while acting in an investigatory function and without any probable cause to believe Plaintiff or his codefendants committed this crime, conspired with the defendant officers to procure a fabricated confession from Plaintiff. For her part, ASA Armbrust helped to manufacture a false statement that she attributed to the Plaintiff she knew he did not make. Defendant Armbrust knew that Plaintiff was innocent.

5.     The only witnesses to the murder who identified Plaintiff were coerced. No physical evidence connected him to the crime. Without the Defendants' concealment of evidence, falsification of evidence, manipulation of witness testimony, and physical coercion of Plaintiff's false inculpatory statements, Plaintiff would never have been charged or convicted.

6.     All of the defendants concealed the fact that they had conspired to and did frame Plaintiff for the murders by inter alia: 1) taking him without a warrant; 2) illegally holding Plaintiff at the police station; 3) physically and mentally coercing Plaintiff; 4) attributing fabricated oral admissions; 5) denying Plaintiff's mother access to him; 6) failing to have a youth officer present; 7) coercing, threatening, and manipulating witnesses into making false statements implicating Plaintiff in the murder; 8) placing Plaintiff in an unreliable lineup; 9) writing a fabricated statement;

10) physically and mentally coercing a fabricated handwritten statement from Plaintiff that he signed; and concealing their misconduct from the assistant state's attorneys who prosecuted the case and Tyrone's defense counsel.

7.      The plaintiff had two co-defendants, Nicholas Escamilla and Miguel Morales, who were both also framed. Both were convicted in jury trials. Escamilla was sentenced to 45 years in prison, and Morales was sentenced to 27 years in prison.

8.      The plaintiff pleaded guilty after losing his motion to suppress his fabricated written statement. He was sentenced to 25 years in prison.

9.      For nearly two decades, the Plaintiff fought to prove his innocence while the defendant officers continued to frame countless men and lie about it under oath. Indeed, the Defendants in this case are among the most notorious repeat offenders in the history of the Chicago Police Department and responsible for dozens of wrongful convictions.

10.     Knowing Reyna had been framed, on October 31, 2023, the State of Illinois sought to vacate the Plaintiff's conviction. That same day, the State moved for an order to *nolle prosequi* the charges against the Plaintiff. The plaintiff had already served his entire sentence and term of mandatory supervised release and spent years wrongfully labeled as a convicted felon.

11.     Plaintiff now seeks compensation for the incalculable hardship and injury he suffered because of the Defendants' egregious misconduct.

## **JURISDICTION AND VENUE**

12.     This action is brought pursuant to 42 U.S.C. § 1983 to redress the deprivation under color of state law of the Plaintiff's rights as secured by the United

States Constitution as well as the deprivation of rights under Illinois state law.

13.     This Court has jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1367. Venue is proper under 28 U.S.C. §1391(b), because events giving rise to the claims asserted occurred in this judicial district.

## PARTIES

14.     Tyrone Reyna (Tyrone) is a 47-year-old man, a citizen of the United States, and resides in Evergreen Park, Illinois. Tyrone was sentenced to 25 years in the Illinois Department of Corrections for a murder he did not commit. He spent 14 years incarcerated in prison and 3 years on supervised release.

15.     At all relevant times hereto, Detectives Kenneth BOUDREAU, Star No. 20435; John HALLORAN, Star No. 20435; R. MCGUIRE, Star No. 20128; Ellyn WEISS, Star No. 20264; G. CARROLL, Star No. 20346; James O'BRIEN, Star No. 20446; Bernard RYAN, Star No. 20867; M. PORCHODO, Star No. 20246; and Youth Officer Alberta Gordon, Star No. 4804; were members of the Chicago Police Department. All are sued in their individual capacities and acted under the color of state law and within the scope of their employment during the investigation of the murder.

16.     Defendant Karen Armbrust, at all relevant times, was an Assistant Cook County State's Attorney. Defendant Armbrust, while acting in an investigatory fashion, procured a fabricated statement from Plaintiff. This Defendant is sued for conspiring with the Defendant Detectives and Officers to frame the Plaintiff while acting in an investigatory capacity and without probable cause to believe that the Plaintiff committed a crime.

17.     The Defendant City of Chicago is an Illinois Municipal Corporation, which employs or employed the Police Officer Defendants at the time of the events

explained in this suit.

18.     Defendant Cook County is a governmental entity within the State of Illinois that provides funding for the Cook County State's Attorney's Office, which is responsible for paying any judgment entered against the Defendant Assistant State Attorney Armbrust.

19.     Each of the individual Chicago Police Officer Defendants and the Assistant State's Attorney Defendant is sued in his or her individual capacity, and each acted under color of state law and in the scope of his or her employment while engaging in the actions alleged in this Complaint.

## FACTUAL ALLEGATIONS

20.     On February 2, 1993, Hector Olaque was a 19-year-old Hispanic man who was shot and killed while standing with some teenagers in a parking lot on the south side of Chicago, across the street from Currie High School, in the parking lot at 5004 South Archer, Chicago, Illinois.

21.     Plaintiff Reyna had an alibi for the time of the shooting; he was on the northside of the city with his aunt, Arlene Barajas, his uncle, Rigoberto Barajas, and his cousin, Rigoberto Barajas, Jr. He was not present at the shooting, was not involved in the shooting, and did not know who committed or was involved in the shooting.

**The Olaque's Murder Investigation**

22.     The teens Olaque was standing with when he was shot were on their lunch break from Currie High School. Several teenagers witnessed the shooting. A Chicago Police detective who investigated described the scene as a state of mass confusion. Almost immediately, 15 to 20 of the supposed witnesses were taken to Area

1 for questioning.

23.      The teenagers brought to Area 1 were placed in small interrogation (interview) rooms. Some were placed with other teenagers, and some were placed alone in rooms. Many had to wait hours before speaking to a detective. All of the teenagers were questioned without a parent or a youth officer being notified or being present for the questioning.

24.      One of the teenagers the police spoke to was 15-year-old Rafael Robinson. He told them he had noticed a car stopped at a red light. The occupants were trading words and gang signs with some pedestrians. He could not describe the people in the car. Someone threw a brick at the car as it drove away. He saw the same car about five minutes later. He then saw a "Two-sixer" gang member being chased by some Latin Kings. As he turned, another "Two-sixer" fired shots at a Latin King. Olaque was hit by a shot and fell to the ground. Robinson said the shooter was wearing a navy-blue zip-up shirt, and the other person was wearing a Georgetown waist-length pullover coat.

25.      A week later, on February 10, 1993, detectives Halloran and Boudreau arrested an 18-year-old Two-sixer gang member named John Willer. After almost a day in police custody, Willer provided a statement that Miguel Morales had told him that Miguel was responsible for shooting Hector Olaque, and that Miguel had committed the shooting with Nick Escamilla. After the detectives had obtained Willer's coerced written statement, he was taken before the grand jury to repeat his statement that Morales had confessed and said that he had committed the crime with Escamilla.

26.      One or more of the Defendant Detectives then arrested Escamilla at his

home. They falsely claimed Escamilla willingly accompanied them to Area 1 to assist them with their investigation. Once there, the Defendant Detectives physically and mentally coerced a false, fabricated, and fictional court-reported statement from him. They threatened to arrest his pregnant wife and told him that their child would be born at the Cook County jail. They had him stand in a line-up and falsely told him that he had been identified.

27.     At 5:15 a.m., Escamilla provided the coerced confession after being held overnight. In it, he stated that he drove Morales and then 15-year-old Tyrone to the shooting, but they excited his car before carrying it out. He said they had told him they were going to do the shooting, but he did not see it.

28.     In the statement he said that he drove Morales and Tyrone to the high school because Morales wanted to look for his girlfriend. He had parked his car on a side street and Morales and Tyrone got out. Before they got out of his car, he saw Morales had a semi-automatic pistol [the autopsy showed a semi-automatic was not used]. After he heard three shots, he tried to pull away, and as he was doing so, Morales and Tyrone jumped back in the car and told him to leave quickly. Morales said "I think I shot one of those Kings" as they drove away. Escamilla said he drove home, got out of his own car, and Morales and Tyrone then left with his car. The following day, according to Escamilla, Morales came over and told him that he had "killed a King at Curie High School."

29.     It was the first time Tyrone was mentioned.

30.     On the morning of February 11, 1993, detectives arrested Tyrone Reyna, who had just turned 16 years old the day before. He was asleep at his girlfriend's

mother's apartment when his girlfriend woke him up and told him that officers had surrounded the building with their guns drawn. They entered the apartment without a warrant and despite being told they could not do so, handcuffed him, struck him, threw him into a wall as they took him down the stairs, and told him that he would "pay for what he did." When Tyrone asked what he was being arrested for, the detectives would not tell him.

31.     While in the car on the way to Area 1, Tyrone was repeatedly threatened with physical violence and told that he would be beaten upon arrival. He was also poked with a broken armrest from the vehicle during the drive to Area 1.

32.     Tyrone was first placed in a room by himself and handcuffed behind his back. No one came in to talk to him. Then he was moved to another room and handcuffed to the wall. Again no one came in to talk to him. After a while he was moved again and handcuffed behind his back. This was repeated several times. Eventually, the Defendant detectives began to come in and ask him questions, one at a time.

33.     At the area, the detectives repeatedly kept coming in and out of the room Plaintiff was in. They physically abused him. They displayed their firearms, pointing them at him. Plaintiff was crying. They showed him what they claimed were statements that others had supposedly given saying that he had committed this crime, but they would not let him read them. They hit him. They placed him in a lineup where they said he was identified.

34.     In the lineup, Tyrone was placed with Latin Kings, who had also been arrested, The lineup was designed in a way that made it easy to identify Tyrone. Additionally, the detectives, including O'Brien, instructed the individual, Robinson,

who was viewing the lineup who to identify and used physical violence and mental coercion to compel him to identify Tyrone.

35.     While all of this was going on, Plaintiff's mother, who had learned that the Chicago Police had illegally taken him, was frantically searching for her son. She repeatedly called Chicago police stations and Area 1 looking for him but was falsely told that he was not in custody. Eventually, she went to Area 1 and was again told that he was not there. She sat and waited for him.

36.     After Tyrone had been at the police station for hours, an officer or detective finally told his mother he was there and let her in to see him for a few minutes. The Plaintiff's mother asked to stay in the room with her son but was told that she would not be allowed to stay. She was told that she could go across the street and buy him some McDonald's, which she did, returning a few minutes later. After giving her son the food, she was told that she had to leave.

37.     No youth officer came into the room Tyrone was being held in before his mother came to the station to do anything to ensure that the detectives stopped beating or coercing Tyrone or otherwise act to ensure that Tyrone's rights were being protected.

38.     While interrogating Tyrone, the detectives repeatedly provided him with information about the crime and told him that if he confirmed those details, he would be allowed to go home.

39.     Detective Ryan took Tyrone from the area and drove him around in an effort to locate a vehicle that Detective Ryan wanted Tyrone to identify as being used in the crime. However, Tyrone could not identify a vehicle because he was not involved in the crime. After driving Tyrone around for hours, Detective Ryan and Tyrone

returned to Area 1.

40.     Assistant State's Attorney Armbrust was assigned to the felony review unit of the Cook County State's Attorney's office on February 11, 1993, and assigned to this investigation. She arrived at Area 1 sometime around 1:00 p.m. on the afternoon of February 11, 1993.

41.     When ASA Armbrust arrived at the Area, she first interviewed witnesses who were there to assist the police in the investigation. Detective Ryan had already left the Area with Tyrone when ASA Armbrust arrived.

42.     Defendant Armbrust came to the station to investigate and speak to Tyrone before Tyrone had ever provided any inculpatory statement to the police. She first questioned Tyrone to assist the police in their investigation. According to Defendant Ryan's testimony at a motion to suppress, Tyrone did not make an inculpatory statement until he spoke to ASA Armbrust and Ryan.

43.     Defendant Armbrust wrote a fabricated statement that repeated things the Defendant Detectives coerced Tyrone into saying by beating him, mentally abusing him, keeping his mother from him, denying him a youth officer, and telling him what to say. After she had finished preparing the statement, she reviewed with Tyrone a pre-written statement for him to sign.

44.     While Tyrone was being driven around by Detective Ryan, ASA Armbrust wrote a statement for Tyrone to review and sign without speaking with him first. ASA Armbrust was aware that it was the policy of the Cook County State's Attorney's office for statements to be written out in the presence of a suspect, rather than in a separate room.

45.     When Defendant ASA Armbrust interviewed Plaintiff at Area 1 in the presence of Defendant Ryan. Plaintiff told Defendant Armbrust that he was not involved in the shooting and that the Defendant Officers were mistreating him. In the presence of Defendant Armbrust, the Defendant Officer slapped Plaintiff. Defendant Armbrust expressly condoned the Defendant Officers' conduct.

46.     Fearful that his unlawful detention and coercive interrogation would continue indefinitely, Plaintiff signed the statement that he did not write. Present during the signing of the statement were Defendants Ryan, Gordon, and ASA Armbrust. The statement was crafted based on the false story orchestrated by the Defendants.

47.     Defendant ASA Armbrust knew that the statement was false and that Plaintiff was signing it under duress. Plaintiff never told Defendant ASA Armbrust the story that was written on the papers. She wrote the statement on her own, outside of his presence. Plaintiff only agreed to sign it out of fear of continued abuse.

48.     To coerce Tyrone into signing a statement, the defendant detectives and ASA Armbrust intentionally wrote the statement in a way that made it appear that Tyrone was admitting only to being present when someone else shot Olague.

49.     As part of their conspiracy to falsely accuse Tyrone, Detective Ryan and the other Defendant Detectives falsely stated that Youth Officer Gordon had been present during their interviews with Tyrone. They claimed that Tyrone had confessed to participating in the murder, along with Morales and Escamilla before the ASA arrived.

50.     In fact, no youth officer was present with Tyrone while he was being

interrogated by the Defendant Detectives.

51.     In furtherance of their conspiracy to frame Tyrone ASA Armbrust and the defendant detectives falsely claimed that Youth Officer Gordon had been present when she interviewed Tyrone in the early afternoon, when he first allegedly confessed to her that he took part in this murder along with Morales and Escamilla.

52.     In fact, no youth officer was present with Tyrone in the afternoon.

53.     Youth officer Gordon did not arrive for work until 4:00 p.m. on February 11, 1993, and testified at Tyrone's Motion to Suppress his Statement that she first saw Tyrone at 6:00 p.m. that night.

54.     The defendant detectives, Officer Gordon, and ASA Armbrust all knew that the law required a youth officer to be present while Tyrone was being questioned and if he provided a statement. To make it appear that a youth officer was present, they all conspired with Officer Gordon to falsely claim that she had been present when Tyrone was questioned and to have her sign the statement indicating that she had been present. They also conspired to have the police reports falsely reflect that she had been present during the questioning.

55.     Tyrone told the Defendant Officers that he was not involved and that he had an alibi. The plaintiff repeatedly denied any involvement in the shooting. The Defendant Officers made no effort to corroborate his alibi.

56.     Tyrone was told by Defendant Ryan and other Defendant detectives that if he admitted being present for the shooting, he was only a kid, and he would be allowed to go home.

57.     The Defendants placed Tyrone in a second lineup after he was charged

and at the county jail. It was a suggestive lineup designed to have Tyrone and Morales identified.

### Wrongful Prosecution of Plaintiff Reyna

58.     Tyrone was charged with the murder of Olaque.

59.     The State's case consisted entirely of fabricated evidence that was provided by the Defendant Detectives, Officers and Defendant ASA.

60.     Defendants fabricated false police reports and statements to create probable cause for charging the Plaintiff with murder. At the time, the Plaintiff was a juvenile but was still detained without bond. The grand jury indicted him solely based on the fabricated evidence created by the defendants.

61.     Defendants falsely testified at Plaintiff's motion to suppress hearing trial that Plaintiff voluntarily accompanied them to the Area and made incriminating statements. They also falsely denied striking Plaintiff.

62.     Defendant Ryan testified that Plaintiff admitted his involvement in the crime to him and Defendant Gordon. Defendants Ryan, Halloran, and Gordon falsely testified that Plaintiff was never physically assaulted or threatened by any officer, including themselves. Defendant Ryan did not disclose that he and his fellow officers manufactured a narrative to frame Tyrone or that they demanded Plaintiff to repeat the false story. Defendants Ryan, Gordon, and Armbrust falsely testified that Plaintiff's handwritten statement was voluntarily provided, and that the information contained in the statement came from Plaintiff. Defendants Ryan, Halloran, and Gordon falsely testified that Plaintiff was never physically assaulted or threatened by any officer, including themselves. Defendant Ryan did not disclose that he and his fellow officers

manufactured a narrative to frame Tyrone or that they demanded Plaintiff to repeat the false story. Defendants Ryan, Gordon, and Armbrust falsely testified that Plaintiff's handwritten statement was voluntarily provided and that the information contained in the statement originally came from Plaintiff.

63.     Morales went to trial in March of 1994. By then, Willer had publicly recanted his statement and explained how the detectives had physically abused him during his all-day interrogation. However, the prosecution was allowed to use his handwritten statement that was given to Defendant Halloran and his grand jury testimony. Even though his physical description did not match the descriptions Robinson and others had initially given the police, the jury convicted Morales. He was sentenced to 45 years in prison.

64.     In May of 1994, Escamilla went to trial. The prosecution's case relied on his statement claiming that he saw Morales with a semi-automatic pistol. Although the autopsy revealed that Olague had been killed with a .38 caliber bullet, which could not have been fired from a semi-automatic weapon, Escamilla was convicted and sentenced to 29 years in prison.

65.     On April 18, 1994, the plaintiff pleaded guilty to first-degree murder instead of risking a trial. He did so because he was afraid that the defendants would repeat their false narrative during the trial. As a result, he was sentenced to 25 years in the Illinois Department of Corrections.

**Plaintiff's Exoneration**

66.     Although he had pled, Plaintiff always maintained his innocence and worked tirelessly to prove it.

67.     Despite limited education and no resources, Plaintiff attempted to demonstrate his innocence through the filing of post-conviction petitions and federal proceedings as a *pro se* litigant. When these were denied, he would file appeals.

68.     Armed with new evidence showing a prodigious pattern and practice of misconduct by the Defendant Officers dating back decades, Plaintiff filed a petition to vacate his conviction on August 7, 2023. He alleged he was innocent.

69.     On August 10, 2023, the Cook County State's Attorney's Office told the circuit court judge hearing the motion to vacate that it did not oppose Plaintiff's request to vacate his conviction. On October 31, 2023, Plaintiff's conviction was vacated.

### Plaintiff's Damages

93.     The plaintiff has suffered and continues to suffer enormous physical and psychological injury as a direct and proximate result of the defendants' misconduct. The plaintiff was incarcerated for 14 years for a crime he did not commit. Every day, he woke up to the reality of not knowing whether he would see his family outside prison property or ever successfully prove the wrongfulness of his conviction and incarceration. Additionally, he spent three more years on supervised release.

94.     Tyrone has been trying for years to build a life for himself outside of prison, without the benefit of the life experiences that most adults have, such as their late teens and twenties, which would normally prepare them for this task.

95.     Tyrone has suffered a great deal of emotional pain and distress due to the loss of his formative years. During his time in prison, he was deprived of basic human experiences that free people take for granted. He missed out on the chance to live independently, celebrate holidays, witness life events with loved ones, have

relationships, fall in love, get married, pursue a career, join the military, attend school, and enjoy the fundamental freedom to live as an autonomous human being. After his release, he had to face the stigma and prejudice associated with being labeled as a violent criminal involved in murder, which led to further deprivation of life experiences.

96. As a result, Tyrone suffered tremendous damage, including but not limited to physical harm, mental suffering, and loss of a normal life, all proximately caused by Defendants' misconduct.

97. As a result of the defendants' actions, the plaintiff continues to experience physical and psychological pain and suffering, humiliation, constant fear and anxiety, deep depression, despair, rage, and other physical and psychological effects from his years of wrongful conviction.

## Pattern of Misconduct By Defendants

70. Since his conviction, Plaintiff Reyna has learned that his experience with the Defendant Officers of Area 1 is not unique. This was not the first instance of Defendants using physical and psychological abuse to close a case. These detectives have a long-standing pattern of engaging in such misconduct.

71. For example, in the "Englewood Four" case, all four convicted men were exonerated when DNA from a serial rapist-murderer was discovered at the crime scene; that same DNA excluded all four defendants. One or more of the defendants coerced false confessions. The City of Chicago paid over $31 million to settle the claims. Just like here, Defendants told the Englewood Four they could go home if they cooperated by confessing to the crime.

72. Defendants Boudreau, Halloran, O'Brien, and Ryan are the most

notorious homicide detectives who have a lengthy history of physically and psychologically coercing suspects to "confess" to serious violent crimes.

73. Defendants have obtained murder confessions from dozens of people who have since been exonerated.

74. As *The Chicago Tribune* long ago observed, "Boudreau stands out not only for the number of his cases that have fallen apart, but for the reasons. In those cases, Boudreau has been accused by defendants of punching, slapping or kicking them; interrogating a juvenile without a youth officer present; and of taking advantage of mentally retarded suspects and others with low IQs." See "Veteran Detective's Murder Cases Unravel," *The Chicago Tribune*, December 17, 2001, available at https://www.chicagotribune.com/investigations/chi-011217confession-story.html (last visited on July 18, 2023).

75. For a two-year period in the early 1990s, Defendants Boudreau and his partners helped "solve" at least five murders with "confessions" that ended with acquittals. All these suspects alleged that Defendant Boudreau and/or Defendant Halloran mistreated them to obtain false confessions.

76. Defendants Boudreau, Halloran, O'Brien, and Ryan have been found by numerous trial and appellate courts to have engaged in a pattern and practice of abuse between 1990 and 2001.

77. The list of abuses by Defendant Officers Halloran, Boudreau, Ryan, and O'Brien includes the following, all of which are corroborated by sworn testimony:

      a. In 1988, Defendant Halloran and a partner struck Mickey Grayer in the stomach and groin with a flashlight and punched and choked him.

b.      In 1990, Cortez Brown was tortured by Defendant O'Brien into confessing to two murders with which he had absolutely nothing to do. Defendant O'Brien, along with Detectives John Paladino and Anthony Maslanka, beat Brown about his head and body, including with a flashlight. Brown was denied food and his right to an attorney.

c.      In September 1991, Defendant Boudreau and others physically and emotionally abused 15-year-old Anthony Jakes to coerce a false confession for a murder he did not commit. During the over 16 hours Jakes was held and interrogated, Boudreau and others slapped, punched, and kicked Jakes, threatened to recruit gang members to kill his family, tried to burn Jakes with cigarettes, and deprived him of access to food, water, and contact with an attorney or family member. Jakes was convicted of the murder based on his false confession. In 2018, his conviction was vacated, and Jakes filed a federal civil rights lawsuit against Boudreau and his cohorts.

d.      In 1991, fifteen-year-old John Plummer was interrogated for 36 hours by Defendants Boudreau, Halloran, and others. After being physically beaten, he falsely confessed to murder. Defendant Halloran has taken the Fifth Amendment regarding Plummer's allegations.

e.      In 1991, Defendant Boudreau obtained a murder confession from Alfonzia Neal. Neal testified that he waived his rights and signed a statement handwritten by a prosecutor. Experts determined that Neal had an IQ in the 40s and was incapable of intelligently waiving his Miranda rights. Despite his signed confession, Neal was acquitted at trial.

f.      Gregory Logan was interrogated regarding a murder in 1991 by Defendant O'Brien and other officers. When he professed his innocence, the detectives beat him with a bat, pushed his head against the wall, and pointed a gun to his head. He was also denied the right to an attorney.

g.      In 1992, Arnold Day was interrogated in connection with murder investigations. After isolating Mr. Day in an interrogation room for hours, Defendant Boudreau forcefully grabbed Day by the neck and choked him. The detectives also threatened to throw Day out the window. Day ultimately confessed but was nonetheless acquitted of the murder after presenting compelling allegations of police torture.

h.      In November 1992, defendants Boudreau, Halloran, and O'Brien coerced Harold Hill, Dan Young, and Peter Williams to give false confessions to raping and murdering a woman. It was later discovered that Williams was actually in prison at the time of the crime, making it impossible for him to have committed it. Despite being innocent, Hill and Young were wrongly convicted based on their coerced confessions, which falsely implicated Williams. Subsequent DNA evidence proved Hill and Young's innocence, leading to their release from prison.

i.      In 1992, Clayborn Smith was interrogated for 37 hours regarding a murder he had no knowledge of. Despite Smith's claims of innocence, a detective physically assaulted him, while other defendants threatened to charge his pregnant girlfriend if he did not confess. Smith was subjected to physical abuse, mental coercion, and threats towards his girlfriend. As a result of these actions,

Smith falsely confessed. However, after a new trial was ordered due to the appellate court's recognition of the torture Smith endured, his statement was suppressed. The trial court determined that Smith had been physically and mentally coerced and that his girlfriend had been threatened.

j.      In 1992, Kilroy Watkins was arrested and handcuffed to a metal ring in an interrogation room by Defendants Boudreau and Halloran, who then choked and punched him to get him to confess to a shooting. After more than 30 hours in this room with minimal sleep and food, Watkins signed a false incriminating statement.

k.      Tyrone Hood was physically assaulted by Boudreau, Ryan, and others while he was held at the lockup at 51st and Wentworth. Hood was also interrogated by Boudreau and Halloran. Additionally, several witnesses in Hood's case claimed that the Defendants coerced them and him, either physically or psychologically. Hood was later granted a Certificate of Innocence, and his civil lawsuit against Defendants Ryan, Boudreau, Halloran, and others was settled.

l.      Hood's co-defendant was Wayne Washington. Washington alleged that he was held for two days. During that time, he was handcuffed, slapped in the face, had his chair knocked out from under him, threatened, and not given food or water until he agreed to give a false and fabricated statement inculpating himself and Hood in the murder. Washington was 18 years old. The Illinois Supreme Court found the detectives isolated him, handcuffed him to a chair, kicked his chair over, and pushed and slapped him. He signed the prewritten

confession because the officers told him he could go home if he did. *People vs. Washington,* IL 127952 ¶57. Washington was granted a COI, and his civil lawsuit against Defendants Ryan, Boudreau and Halloran was settled.

m.     In 1993, Emmett White was arrested by Defendants O'Brien, Halloran, and other detectives. They hit him in the face, punched him in the body, threw him to the ground, and stepped on his face, dragging his head across the floor of the interrogation room in an attempt to get him to falsely confess. Photographs of Mr. White corroborated his testimony of his abuse. Although the police alleged that White confessed to the crime, when asked about White's allegations that he was beaten about the face and body, O'Brien and Halloran pled the Fifth Amendment when questioned about the interrogation.

n.     In December 1993, defendants Boudreau and O'Brien, along with other detectives, coerced confessions from two intellectually disabled juveniles, Fred Ewing and Darnell Stokes, who were classmates in special education courses, in connection with two separate murders. An expert concluded that Ewing "was unable to comprehend the substance of the confession which he allegedly made." Despite the confessions obtained by these defendants and in the absence of any other evidence connecting them to the crime, both Ewing and Stokes were acquitted.

o.     In 1994, Defendant Halloran and other police officers forced Sheila Crosby and Michael Sardin to identify Shondell Walker as the murderer in their grand jury testimonies. Halloran threatened to have the Department of Children and Family Services take Sheila Crosby's children away from her. They told

Sardin that if he did not name Walker, he would be charged with the murder.

p. Derrick Flewellen was coerced into signing a confession by Defendants Boudreau, Halloran, and others after being interrogated for over 36 hours. During this time, he was physically abused by Boudreau and other detectives, including being slapped, kicked, punched, and slammed into a wall, ultimately succumbing to their coercion. Flewellen spent almost five years in prison before being acquitted of the two murders when DNA tests proved that the crime was committed by someone else.

q. In August 1994, David Wright was arrested and coerced into giving a false confession. Wright alleged that Boudreau physically assaulted him, including choking him and shoving him against the wall, and made a false promise of leniency. As a result, after an extended period in custody, Wright falsely confessed. Following an evidentiary hearing in 2022, that confession was suppressed, and the State dismissed all charges against Wright.

r. In 1995, Defendants Boudreau, Halloran, and O'Brien interrogated and coerced confessions from Oscar Gomez, Eric Gomez, and Abel Quinones. Their tactics included holding all three men for 30 hours, beating them while they were shackled to the wall, and preventing them from communicating with an attorney or their families. This successful attempt coerced false confessions from the three men. All three defendants were found not guilty, largely because the detectives physically coerced their confessions.

s. Kylin Little was a witness to a 1996 murder. When O'Brien, Halloran, and Boudreau interrogated him, they physically and psychologically

coerced him until he lied and implicated Eric Gibson, a man who had absolutely nothing to do with the crime. After his interrogation, Little fully recanted the statement he gave to the police.

t.      In February 1997, Robert Wilson falsely confessed to slashing a woman with a knife after being slapped and threatened by Defendant O'Brien. O'Brien withheld evidence from the victim that another man, who exactly fit the description of the perpetrator, had slashed several persons in the same area at about the same time. The victim ultimately recanted her identification of Wilson, but not before Wilson had spent almost 10 years in jail. In a deposition in an unrelated civil suit, O'Brien and Halloran both took the Fifth Amendment when questioned about Wilson's allegations of abuse.

u.      After police officer Michael Ceriale was shot to death in 1998, Defendant Boudreau and other detectives arrested Jonathan Tolliver at 4:00 a.m. and interrogated him for a 24-hour period. This interrogation resulted in allegedly incriminating (unwritten and unsigned) statements. Tolliver was never advised of his rights, no Miranda waiver was created, and his request to speak with a lawyer and/or his mother were both refused. Boudreau claimed that the protections for minors were not utilized because Tolliver, who was 16 years old, had lied about his age, falsely claiming to have been eighteen. After two trials, Tolliver was convicted of Ceriale's murder.

v.      Defendant Boudreau and others coerced statements from other witnesses to incriminate Tolliver. They used various methods of coercion, including intentionally withholding insulin from a diabetic witness for over 24

hours. When these witnesses later refused to testify at trial in line with the false statements coerced by Boudreau, it raised serious concerns.

78.     The codefendants and witnesses involved in the investigation of the crime for which Plaintiff was convicted all made similar allegations against the Defendant Detectives.

### The City of Chicago's Policy and Practice of Prosecuting Innocent People in Violation of their Constitutional Guarantees

79.     The Chicago Police Department is responsible by virtue of its official policies and practices for scores of miscarriages of justice like those its employees inflicted on Plaintiff.

80.     In this case, the defendant officers' coercion of false statements from Plaintiff's co-defendants and each of the witnesses was undertaken pursuant to and proximately caused by a department policy and practice.

81.     Since the 1980s, hundreds of cases have come to light in which Chicago police officers fabricated false evidence and/or suppressed exculpatory evidence to convict innocent people for serious crimes they did not commit.

82.     The cases include many instances in which Chicago police detectives and officers used the same tactics that the Defendants employed against the Plaintiff in this case. These tactics include but are not limited to, using physically and psychologically coercive methods to obtain involuntary and false confessions, fabricating evidence, concealing exculpatory evidence, and manipulating or threatening witnesses to influence their testimony. All these actions were taken to secure the arrest, prosecution, and conviction of a person without probable cause and without regard to the person's actual guilt or innocence.

83.     At all times relevant hereto, members of the Chicago Police Department, including the Defendants in this action, routinely fabricated evidence against innocent people by coercing (physically and psychologically), manipulating, threatening, pressuring, and offering inducements to suspects and witnesses.

84.     As a matter of widespread custom and practice, members of the Chicago Police Department, including the Defendants in this action, contrived false narratives that were fed to vulnerable suspects and witnesses, who then adopted those false narratives as their own so police could secure the wrongful conviction of an innocent person.

85.     Furthermore, Chicago Police Department officers systematically suppressed exculpatory and/or impeaching material by concealing evidence that a witness was coerced, manipulated, threatened, pressured or offered inducements to make false statements.

86.     In addition to the problems identified above, the City of Chicago and the Chicago Police Department routinely failed to investigate cases in which Chicago police detectives recommended charging an innocent person with a serious crime, and no Chicago police officer has ever been disciplined as a result of his misconduct in any of those cases.

87.     Before and during the period in which Plaintiff was falsely charged with this murder, and later convicted of the murder, the City of Chicago operated a dysfunctional disciplinary system for Chicago police officers accused of serious misconduct. The City's Office of Professional Standards almost never imposed significant discipline against officers accused of violating civilians' civil and

constitutional rights. The Chicago Police disciplinary apparatus included no mechanism for identifying police officers who were repeatedly accused of engaging in misconduct.

88.     As a matter of both policy and practice, municipal policymakers and department supervisors condoned and facilitated a code of silence within the Chicago Police Department. In accordance with this code, officers refused to report and otherwise lied about misconduct committed by their colleagues, including the misconduct at issue in this case.

89.     As a result of the City of Chicago's established practice of not tracking and identifying police officers who are repeatedly accused of the same kinds of serious misconduct, failing to investigate cases in which the police are implicated in a wrongful charge or conviction, failing to discipline officers accused of serious misconduct, and facilitating a code of silence within the Chicago Police Department, officers (including the Officer Defendants here) have come to believe that they may, without fear of adverse consequences, violate the civil rights of members of the public and cause the innocent to be charged with serious crimes. As a result of these policies and practices of the City of Chicago, members of the Chicago Police Department act with impunity when they violate the constitutional and civil rights of citizens.

90.     The City of Chicago and its Police Department also failed in the years before Plaintiff's wrongful charging and conviction to provide adequate training to Chicago Police Detectives and other officers in the following areas, among others:

   a.     The need to refrain from physical and psychological abuse of, and manipulative and coercive conduct toward, suspects and witnesses.

b.    The constitutional requirement to disclose exculpatory and impeachment evidence, including how to identify such evidence and what steps to take when exculpatory and/or impeachment evidence has been identified to ensure the evidence is part of the criminal proceeding.

c.    The risks of engaging in tunnel vision during investigation.

d.    The need for full disclosure, candor, and openness on the part of all officers who participate in the police disciplinary process, both as witnesses and as accused officers, and the need to report misconduct committed by fellow officers.

91.    The need for police officers to be trained in these areas was and remains obvious. The City's failure to train Chicago police officers as alleged in the preceding paragraph proximately caused Plaintiff's wrongful conviction and his injuries.

92.    The City's failure to train, supervise, and discipline its officers, including the Officer Defendants, condones, ratifies, and sanctions the kind of misconduct that Defendants committed against Mr. Reyna in this case. Constitutional violations like those that occurred in this case are encouraged and facilitated as a result of the City's practices and *de facto* polices, as alleged above.

98.    The City of Chicago and final policymaking officials within the Chicago Police Department failed to act to remedy the patterns of abuse described in the preceding paragraphs, despite actual knowledge of the pattern of misconduct. They thereby perpetuated the unlawful practices and ensured no action would be taken (independent of the judicial process) to remedy Plaintiff's ongoing injuries.

99.    The City of Chicago's policymakers also approved the policies and

practices described in the foregoing paragraphs and were deliberately indifferent to the violations of constitutional rights described herein.

## THE DEFENDANT OFFICERS' PATTERN OF MISCONDUCT WITH JUVENILES AND THE CITY'S PRACTICE OF FACILITATING SUCH MISCONDUCT

100.    The Defendant Officers' egregious misconduct in this case was not an isolated occurrence. It was undertaken pursuant to, and proximately caused by, the *de facto* policies and practices of the City of Chicago, acting through the CPD and its officers, which were in place at all relevant times pertaining to this case.

101.    Tyrone was coerced into giving false and inculpatory statements pursuant to such municipal policy. The CPD and its detectives and police officers have a long history of using physically and psychologically coercive interrogation tactics to elicit statements from suspects and witnesses in criminal cases, causing hundreds of false confessions and wrongful convictions in the City of Chicago.

102.    Defendants Halloran, Boudreau, Ryan, and O'Brien are notorious detectives who had lengthy track records of coercing and manufacturing confessions from youth.

103.    At all relevant times, the City of Chicago had a policy and practice of coercing false confessions from those in police custody and using these statements to obtain wrongful convictions. Pursuant to this municipal policy and practice, CPD officers, including the officers at Area 1, used interrogation tactics identical or similar to those employed by the Defendants in this case to extract confessions. These tactics included: a) psychological intimation and manipulation; b) the use of clearly unreliable

or coerced informants and/or witnesses; c) the fabrication of confession; d) the misleading of parents/guardians and denial of access to their children during interrogations; e) the denial of access to counsel; f) the concealment of exculpatory information; g) false promises of leniency in exchange for "cooperation" in the form of confession; h) sleep and food deprivation; and i) the use of other unlawful tactics to secure the arrest, prosecution, and conviction of persons, including juveniles and teenagers, without regard to their actual guilt or innocence of the offense.

104.    Juveniles and young adults, including Tyrone, were the most valuable targets of this municipal policy. Law enforcement officers are trained to know that youth are inherently more suggestible, susceptible to manipulation, and frequently lack the ability to fully understand – let alone assert – their rights during an interrogation. As a matter of widespread custom and practice, CPD officers, including but not limited to the Defendant Officers, exploited the vulnerability and suggestibility of youth in their custody to obtain false confessions and close open cases. CPS detectives systematically denied juvenile and teenage suspects access to their guardians and to counsel, fed them details of the crime, made false promises of leniency, and generally subjected these youth to immense physical and psychological pressure until they "confessed." This practice is aided, perpetuated, and enhanced by the Chicago Police Department's policy and practice of using so-called "youth officers" to assist in coercion of juveniles during interrogations as set forth more fully in this Complaint.

105.    Also pursuant to municipal policy and practice, members of the CPD, including the Defendant Officers, systematically suppressed evidence pertaining to the fabricated and coerced confessions obtained in interrogations. This exculpatory

information was concealed both from trail attorneys within the Cook County State's Attorney's Office and from criminal defendants and their counsel. In furtherance of this municipal policy and practice, CPD officers, including the defendants in this case, repeatedly committed perjury while testifying in criminal proceedings in order to conceal their use of coercive interrogation techniques. Defendants committed this same misconduct in this case.

106.    At all relevant times, the City of Chicago also had in place *de facto* policies and practices by which CPD officers, including the Defendant Officers, were led to believe they could act with impunity, which served to facilitate and further their misconduct. These policies and practices include failing to identify and track officers who commit serious misconduct; failing to investigate cases in which CPD officers are implicated in obtaining coerced and false confessions, as well as unfounded charges and wrongful convictions; failing to meaningfully discipline officers accused of such unlawful conduct; and facilitating a code of silence within the CPD. Pursuant to the City's code of silence, CPD officers were trained and required to lie or remain silent about misconduct committed on the job by their fellow officers.

107.    The City of Chicago's failure to train, supervise, and discipline its officers effectively condoned, ratified, and sanctioned the kind of misconduct that the Defendant Officers committed against Plaintiff and his co-defendants in this case.

108.    The City of Chicago and officials within the CPD failed to act to remedy the abuses described in the preceding paragraphs, despite actual knowledge of the patterns of misconduct. They thereby perpetuated the unlawful practices and ensured that no action would be taken (independent of the judicial process) to remedy Plaintiff's

ongoing injuries

109.     All of the policies and practices described in the foregoing paragraphs were knowingly approved by City of Chicago policymakers, who were deliberatively indifferent to the fact that CPD officers systematically violated the rights of the people they were sworn to protect.

**COUNT I**
**42 U.S.C. § 1983 – Coerced (False) Confession**
**Fifth and Fourteenth Amendments**

110.     Plaintiff repeats and re-alleges all of the paragraphs in this Complaint as if fully set forth herein.

111.     As more fully described above, the individual Police Officer Defendants acting individually, jointly, and in conspiracy, as well under color of law and within the scope of their employment, deprived Plaintiff of his constitutional right to a fair trial, in violation of the Fifth and Fourteenth Amendments by using violence, threats of violence, trickery, manipulation, and deceit to compel Plaintiff against his will to make or adopt statements that were later used to convict him.

112.     In the manner described more fully above, Defendants coerced Plaintiff to make or adopt statements that were introduced as inculpatory evidence for crimes they knew he did not commit. Defendants falsified police reports and gave false testimony before a grand jury and at trial about the misconduct they used in securing this false evidence. They failed to correct the fabricated evidence that they knew to be false when it was used against Plaintiff at his criminal trial.

113.     The Police Officer Defendants concealed and fabricated additional evidence that is not yet known to Plaintiff.

114.     Absent this misconduct, Plaintiff would not have been wrongfully convicted of the murder of Olague. Thus, the defendants' misconduct deprived Plaintiff of his constitutional right to a fair trial and directly resulted in Plaintiff's wrongful conviction.

115.     Notwithstanding its effect on the outcome of the trial or even the truth or falsity of the statements, the mere use of Plaintiff's physically coerced statements at his trial violates his Fifth and Fourteenth Amendment rights against compelled self-incrimination.

116.     The misconduct described in this Count was objectively unreasonable and was undertaken intentionally, with malice, with reckless indifference to the rights of others, and in total disregard of the truth and Plaintiff's clear innocence.

117.     As a direct and proximate result of this deprivation of his constitutional right to a fair trial, Plaintiff suffered injuries, including but limited to loss of liberty, great mental anguish, humiliation, degradation, emotional pain and suffering, and other grievous and continuing injuries and damages.

118.     The misconduct described above in this Count by the Defendant officers was undertaken pursuant to the Chicago Police Department's policy and practice, in the manner more fully described below.

## COUNT II
## 42 U.S.C. § 1983 – Fabrication of Evidence

119.     Plaintiff repeats and re-alleges all of the paragraphs in this Complaint as if fully set forth herein.

120.     As more fully described above, the Defendants acting individually, jointly, and in conspiracy, as well under color of law and within the scope of their

employment, deprived Plaintiff of his constitutional right to a fair trial, in violation of the Fifth and Fourteenth Amendments by fabricating Plaintiff's inculpatory statements and by testifying at Plaintiff's trial about those statements and by fabricating Tyrone Reyna's statements and using those statements to force Plaintiff's conviction.

121.    In the manner described more fully above, Defendants fabricated, coerced, and strong-armed a false handwritten statement from the Plaintiff that he signed under duress to stop the abusive interrogation. That fabricated statement was used against him as evidence.

122.    In the manner described more fully above, Defendants fabricated, manipulated and/or solicited false statements from Plaintiff implicating Plaintiff in the crimes that they knew he did not commit; falsified police reports; obtained Plaintiff's conviction using this false evidence; and failed to correct fabricated evidence that they knew to be false when it was used against Plaintiff.

123.    Defendant ASA Armbrust fabricated a false oral statement out of the blue that she attributed to the Plaintiff and then wrote a statement she made up but claimed he said.

124.    The Police Officer Defendants and Prosecutor Defendants concealed and fabricated additional evidence that is not yet known to Plaintiff.

125.    Absent this misconduct, Plaintiff would not have been wrongfully convicted of the murder of Olague. Thus, the defendants' misconduct deprived Plaintiff of his constitutional right to a fair trial and directly resulted in Plaintiff's wrongful conviction.

126.    The misconduct described in this Count was objectively unreasonable

and was undertaken intentionally, with malice, with reckless indifference to the rights of others, and in total disregard of the truth and Plaintiff's clear innocence.

127. As a direct and proximate result of this deprivation of his constitutional right to a fair trial, Plaintiff suffered injuries, including but limited to loss of liberty, great mental anguish, humiliation, degradation, emotional pain and suffering, and other grievous and continuing injuries and damages.

## COUNT III - 42 U.S.C. § 1983
## Violation of Due Process

128. Each paragraph of this Complaint is incorporated as if restated fully herein.

129. As described more fully above, all the Defendant Officers and the Defendant ASA, while acting individually, jointly, and/or in conspiracy, as well as under color of law and within the scope of their employment, deprived Plaintiff of his constitutional right to a fair trial.

130. In the manner described more fully above, the Defendant Officers and the ASA, individually, jointly, and/or in concert and in conspiracy, fabricated false reports and other evidence, deliberately withheld exculpatory evidence, destroyed and/or intentionally lost material evidence, and used unduly suggestive identification procedures, and hid their own misconduct. In doing so, the Defendants violated their clearly established duties to report all material exculpatory and impeachment information to prosecutors, to preserve material evidence and to ensure the integrity of eyewitness identifications.

131. Absent Defendants' misconduct, the prosecution of Plaintiff could not and

would not have been pursued, and Plaintiff would not have been convicted.

132.    The Defendants' misconduct directly and proximately resulted in the unjust and wrongful criminal conviction of Plaintiff and his continuing wrongful imprisonment, thereby denying him his constitutional right to a fair trial, in violation of the Due Process Clause of the United States Constitution.

133.    As a direct and proximate result of this violation of his constitutional right to a fair trial, Plaintiff suffered injuries, including but not limited to loss of liberty, physical sickness and injury, and emotional distress.

134.    The misconduct described in this Count was objectively unreasonable and was undertaken intentionally, with malice and willful indifference to Plaintiff's clearly established constitutional rights.

## COUNT IV – 42 U.S.C. § 1983
### Failure to Intervene

135.    Each paragraph of this Complaint is incorporated as if restated fully herein.

136.    In the manner described above, by their conduct and under color of law, during the constitutional violations described herein, one or more of the Defendants stood by without intervening to prevent the violation of Plaintiff's constitutional rights, even though they had the opportunity to do so.

137.    As a direct and proximate result of the Defendants' failure to intervene to prevent the violation of Plaintiff's constitutional rights, Plaintiff suffered injuries, including but not limited to loss of liberty, physical sickness and injury, and emotional distress.  These Defendants had a reasonable opportunity to prevent this harm but

failed to do so.

138.    The misconduct described in this Count was objectively unreasonable and was undertaken intentionally, with malice and willful indifference to Plaintiff's clearly established constitutional rights.

**COUNT V – 42 U.S.C. § 1983**
**Federal Malicious Prosecution**

139.    Each of the Paragraphs of this Complaint is incorporated as if restated fully herein.

140.    Defendants unreasonably seized the Plaintiff and improperly subjected him to judicial proceedings for which there was no legitimate probable cause. These judicial proceedings were instituted and continued maliciously, resulting in injury, and all such proceedings were ultimately terminated in the Plaintiff's favor in a manner indicative of his innocence.

141.    The defendant officers accused the plaintiff of criminal activity without genuine probable cause, and they made statements to prosecutors with the intent of influencing the judicial proceedings. The defendant officers knew that their statements regarding the plaintiff's alleged culpability were false and perjured. They fabricated evidence, withheld exculpatory information, used unduly suggestive identification procedures to induce a false identification of the plaintiff, and destroyed or lost material and exculpatory evidence.

142.    The misconduct violated Plaintiff's rights under the Fourth Amendment and the procedural and substantive due process components of the Fourteenth Amendment.

143.     The misconduct described in this Court was undertaken with malice, willfulness, and reckless indifference.

144.     The misconduct described in this Court was undertaken pursuant to the City's policy and practice in the manner more fully described above.

145.     As a result of this misconduct, Plaintiff sustained, and continues to sustain, injuries including physical injury and sickness, and emotional pain and suffering.

## COUNT VI
### 42 U.S.C. § 1983 - Coerced and False Confession

140.     Plaintiff repeats and re-alleges all the paragraphs in this Complaint as if fully set forth herein.

141.     In a manner described more fully above, the Police Officer Defendants and Defendant Armbrust, acting in an investigatory capacity and without probable cause to suspect Plaintiff of the crime, individually, jointly, and in conspiracy with one another and others unknown, as well as under color of law and within the scope of their employment, forced Plaintiff to make false statements, involuntarily against his will, which incriminated him and which were used against him in criminal proceedings, in violation of his constitutional rights under the Fifth and Fourteenth Amendments.

142.     In addition, the Police Officer Defendants and Defendant Armbrust, acting as an investigator and without probable cause to suspect Plaintiff of any crime, individually and jointly, and in conspiracy with one another, as well as under color of law and within the scope of their employment, used physical violence and psychological coercion in order to force Plaintiff to incriminate himself falsely and

against his will in a crime he had not committed, in violation of his right to due process secured by the Fourteenth Amendment. This misconduct was so severe as to shock the conscience, it was designed to injure Plaintiff, and it was not supported by any conceivable governmental interest.

143.    Specifically, the police Defendants and Defendant Armbrust conducted, participated in, encouraged, advised, and ordered an unconstitutional interrogation of Plaintiff, using physical violence and psychological coercion and false promises of release, which overbore Plaintiff's will and resulted in him making involuntary statements, or agreeing with statements implicating himself in the shooting.

144.    Those false statements were wholly fabricated by the Defendants and attributed to Plaintiff, who was forced to regurgitate them or affirm them by placing his signature upon a document containing the statements.

145. The misconduct described in this complaint was objectively unreasonable and was undertaken intentionally, and in total disregard of the truth and Plaintiff's clear innocence.

146. Those false incriminating statements were used against Plaintiff to his detriment throughout his criminal case. They were the reason that Plaintiff was prosecuted and convicted of Olague's murder.

147. As a result of Defendants' misconduct described in this complaint, Plaintiff suffered loss of liberty, great mental anguish, humiliation, degradation, physical and emotional pain and suffering, and other grievous and continuing injuries and damages as set forth above.

148. The misconduct described in this Count by the Defendants was undertaken pursuant to the Chicago Police Department's policy and practice.

### COUNT VII – 42 U.S.C. § 1983
### Conspiracy to Deprive Constitutional Rights

149. Each paragraph of this Complaint is incorporated as if restated fully herein.

150. After the murder of Olague, the Defendant Officers and Defendant ASA, acting within the scope of their employment and under color of law, agreed among themselves and with other individuals to act in concert in order to deprive Plaintiff of his constitutional rights, including his rights to due process and to a fair trial, all as described in the various paragraphs of this complaint.

151. Additionally, before and after Plaintiff's conviction, the Defendant

Officers further conspired to deprive Plaintiff of exculpatory information to which he was lawfully entitled and which would have led either to his not being charged, his acquittal, or his more timely exoneration.

152.    In this manner, the Defendant Officers and ASA, acting in concert with other unknown co-conspirators, conspired by concerted action to accomplish an unlawful purpose by unlawful means.

153.    In furtherance of the conspiracy, each of the co-conspirators engaged in and facilitated numerous overt acts, including but not limited to those set forth above – such as fabricating evidence, withholding exculpatory evidence, coercing false statements, using unduly suggestive identification procedures, and committing perjury during hearings and trials – and was an otherwise willful participant in joint activity.

154.    As a direct and proximate result of the illicit prior agreement and actions in furtherance of the conspiracy referenced above, Plaintiff's rights were violated, and he suffered injuries, including but not limited to loss of liberty, physical sickness, and emotional distress.

155.    The misconduct described in this Count was objectively unreasonable was undertaken intentionally, with malice, willfulness, and deliberate indifference to Plaintiff's rights.

## COUNT VIII
### 42 U.S.C. § 1983 – *Brady* Violations

156.    Plaintiff repeats and re-alleges all the paragraphs in this Complaint as if fully set forth herein.

157.    As described in detail above, all of the individual Police Defendants, acting individually, jointly, and in conspiracy, as well under color of law and within the scope of their employment, deprived Plaintiff of his constitutional right to a fair trial, in violation of the Fifth and Fourteenth Amendments by withholding and suppressing exculpatory evidence from Plaintiff and the prosecutors who tried the case.

158.    The Prosecutor Defendant, while acting in an investigatory function, also withheld exculpatory evidence from her fellow prosecutors during the pendency of his criminal proceedings, up to and including the time of Plaintiff's conviction, namely the illegal manner in which the statement had been obtained, the course of techniques, the fact that she had written the statement outside of the presence of the plaintiff, and without questioning him.

159.    The Defendants continued to suppress exculpatory evidence after Plaintiff's conviction. Had this exculpatory evidence been disclosed, Plaintiff would not have spent years in prison for a crime he did not commit.

160.    The misconduct described above was objectively unreasonable and was undertaken intentionally, with malice, willful indifference to Plaintiff's constitutional rights and in total disregard of the truth and Plaintiff's clear innocence.

161.    As a direct and proximate result of this deprivation of his constitutional right to a fair trial, Plaintiff suffered injuries, including but limited to loss of liberty, great mental anguish, humiliation, degradation, emotional pain

and suffering, and other grievous and continuing injuries and damages.

162.    The misconduct described above in this Count by the Defendant officers was undertaken pursuant to the policy and practice of the Chicago Police Department.

## COUNT IX
## 42 U.S.C. § 1983 – Unlawful Detention

163.    Plaintiff repeats and re-alleges all the paragraphs in this Complaint as if fully set forth herein.

164.    As described above, the defendant officers, acting individually, jointly, and in conspiracy, as well as under the color of law and within the scope of their employment, deprived the plaintiff of his Fourth and Fourteenth Amendment constitutional rights.

165.    The Defendants accused Plaintiff of criminal activity and exerted influence to initiate, continue, and perpetuate judicial proceedings against Plaintiff without any probable cause for doing so, in violation of his rights secured by the Fourth Amendment and the procedural and substantive due process components of the Fourteenth Amendment.

166.    The defendants unreasonably seized the plaintiff and improperly subjected him to judicial proceedings without probable cause. These malicious judicial proceedings resulted in injury but were ultimately terminated in the plaintiff's favor, indicating his innocence.

167.    The Defendants subjected Plaintiff to unauthorized and arbitrary governmental action that shocks the conscience in that Plaintiff was deliberately

and intentionally framed for a crime of which he was totally innocent, through the Defendants' procurement of a physically coerced confession, fabrication of evidence, and suppression, and withholding of evidence.

168.    The misconduct described above was objectively unreasonable and was undertaken intentionally, with malice, willful indifference to Plaintiff's constitutional rights, and in total disregard of the truth and Plaintiff's clear innocence.

169.    As a direct and proximate result of this deprivation of his constitutional right, Plaintiff suffered injuries, including but limited to loss of liberty, great mental anguish, humiliation, degradation, emotional pain and suffering, and other grievous and continuing injuries and damages.

170.    The misconduct described above in this Count by the Defendant officers was undertaken pursuant to the policy and practice of the Chicago Police Department.

## COUNT X
## 42 U.S.C. § 1983 – Failure to Intervene

171.    Plaintiff repeats and re-alleges all the paragraphs in this Complaint as if fully set forth herein.

172.    In the manner described above, one or more of the individual defendants, as well as other unknown individuals, stood by without intervening to prevent the alleged constitutional violations, despite having the opportunity to do so.

173.    These Defendants had ample, reasonable opportunities as well as a

duty to prevent this harm but failed to do so.

174. The misconduct described in this Count was objectively unreasonable and was undertaken intentionally, with malice, with willful indifference to Plaintiff's constitutional rights, and in total disregard of the truth and Plaintiff's innocence.

175. As a direct and proximate result of this failure to intervene to prevent the violation of Plaintiff's constitutional rights, Plaintiff suffered injuries, including, but not limited to, loss of liberty, great mental anguish, humiliation, degradation, emotional pain and suffering, and other grievous and continuing injuries and damages.

176. The misconduct described above in this Count by the Defendant officers was undertaken pursuant to the policy and practice of the Chicago Police Department.

### COUNT XI
### 42 U.S.C. § 1983 – *Monell* Policy Claim

177. Plaintiff repeats and re-alleges all the paragraphs in this Complaint as if fully set forth herein.

178. The Chicago Police Department is responsible for scores of miscarriages of justice. Since 1986, hundreds of documented cases have come to light in which Chicago Police Detectives amassed "evidence" against an innocent person for a serious crime that he did not commit. There are undoubtedly many more such cases that have not yet been discovered.

179. The false charges against innocent people include numerous cases

in which Chicago Police Officers used the very same tactics that the Defendant Officers employed against Plaintiff in this case, including: (1) physical abuse and coercion to procure an inculpatory statement/confession; (2) the fabrication of false oral statements; (3) concealment of exculpatory evidence; (4) physical abuse/coercion and manipulation of witnesses in order to obtain false statements against Plaintiff; and (5) the use of other tactics to secure the arrest, prosecution and conviction of a person without regard to his actual guilt or innocence of the offense.

180.    At all times relevant hereto, members of the Chicago Police Department, including but not limited to the Defendants in this action, systematically used prolonged physical violence and psychological coercion to force suspects to make false, inculpatory, and incriminating statements against themselves. As a matter of widespread custom and practice, these physically coerced statements from criminal defendants were routinely used to convict defendants at trial.

181.    Consistent with the municipal police and practice described in the preceding paragraph, employees of the City of Chicago, including but not limited to the named Defendants, used physical violence and psychological coercion to overcome Plaintiff's will and force him to regurgitate a false and fabricated confession that was later used as the primary piece of evidence against him.

182.    At all times relevant hereto, members of the Chicago Police Department, including but not limited to the Defendants in this action,

systematically suppressed exculpatory and/or impeaching material by intentionally secreting discoverable reports, memos and other information in files that were maintained solely at the police department and were not disclosed to the participants of the criminal justice system. As a matter of widespread custom and practice, these clandestine files were withheld from the State's Attorney's Office and from criminal defendants, and they were routinely destroyed at the close of the investigation, rather than being maintained as part of the official file.

183.    Consistent with the municipal policy and practice described in the preceding paragraph, employees of the City of Chicago, including but not limited to the named Defendants, concealed exculpatory evidence from Plaintiff, including evidence that Plaintiff's alleged handwritten statement was involuntary and procured through physical coercion, that Tyrone's statement was procured through physical violence, manipulation, threats and coercion, and that certain oral statements attributed to the Plaintiff were fabricated in their entirety.

184.    At all relevant times, members of the Chicago Police Department, including but not limited to the Defendants in this action, routinely manipulated, tricked, lied to, and misled witnesses to influence their testimony to conform to a false narrative contrived by the officers themselves. As a matter of widespread practice and custom, these tactics were also used to induce false evidence against suspects.

185.    Consistent with the municipal policy and practice described in the

preceding paragraph, employees of the City of Chicago, including but not limited to the named Defendants, manipulated, tricked, and improperly influenced the testimony of Tyrone to falsely implicate Plaintiff in the shooting of Olegue.

186.    In line with the municipal policy and practice outlined in the previous paragraph, employees of the City of Chicago, including the named Defendants, neglected to notify, secure, or have juvenile officers present when questioning, interrogating, or investigating a juvenile.

187.    The City of Chicago and the Chicago Police Department have failed to investigate any of the cases in which Chicago Police Detectives recommended charging an innocent person with a serious crime, and no Chicago Police Officer has ever been disciplined as a result of his misconduct in any of those cases.

188.    Prior to and during 1993, the year in which Plaintiff was falsely charged with the Oligue murder, the City of Chicago operated a dysfunctional disciplinary system for Chicago Police Officers accused of serious misconduct. The Former Chicago Police Officer of Professional Standards almost never imposed significant discipline against police officers accused of violating the civil and constitutional rights of members of the public. The Chicago Police disciplinary apparatus included no mechanism for identifying police officers who were repeatedly accused of engaging in the same type of misconduct.

189.    Municipal policy makers and department supervisors condoned and facilitated a code of silence with the Chicago Police Department as a matter of both policy and practice. In accordance with this code, officers refused to report

and otherwise lied about misconduct committed by their colleagues, including the misconduct at issue in this case.

190.    As a result of the City of Chicago's established practice of not tracking and identifying police officers who are repeatedly accused of the same kinds of serious misconduct, failing to investigate cases in which the police are implicated in a wrongful charge or conviction, failing to discipline officers accused of serious misconduct and facilitating a code of silence within the Chicago Police Department, officers (including the Defendants here) have come to believe that they may violate the civil rights of members of the public and cause innocent persons to be charged with serious crimes without fear of adverse consequences. As a result of these policies and practices of the City of Chicago, members of the Chicago Police Department act with impunity when they violate the constitutional and civil rights of citizens.

191.    The defendant officers have a long history of engaging in the kind of investigative misconduct that occurred in this case, including the physical coercion of fabricated confessions, manipulation of witnesses, fabrication of evidence, and concealment of evidence in the course of maliciously prosecuting innocent persons. There are dozens of known cases in which the Defendant Officers have engaged in serious investigative misconduct, including many cases in which they have manipulated and coerced witnesses and fabricated and concealed evidence, as he did in this case. Defendants engaged in such misconduct because they had no reason to fear that the City of Chicago and its Police

Department would ever discipline them for doing so.

192.    The City of Chicago and its Police Department failed in 1993 and in the years prior to provide adequate training to Chicago Police Detectives and other officers in any of the following areas, among others:

a.    The constitutional requirement to disclose exculpatory evidence, including how to identify such evidence and what steps to take when exculpatory evidence has been identified in order to ensure that the evidence is made part of the criminal proceeding.

b.    The need to refrain from manipulation or potentially coercive conduct in relation to witnesses.

c.    The need to refrain from using physical violence, threats of violence, and psychological coercion to procure involuntary statements from suspects.

d.    The risks of wrongful conviction and the steps police officers should take to minimize risks.

e.    The risks of engaging in tunnel vision during investigation.

f.    The need for full disclosure, candor, and openness on the part of all officers who participate in the police disciplinary process, both as witnesses and as accused officers, and the need to report misconduct committed by fellow officers.

193.    The need for police officers to be trained in these areas was and remains obvious. The City of Chicago's failure to train Chicago Police Officers as alleged in the

preceding paragraph proximately caused Plaintiff's wrongful conviction and his injuries.

194.    The City's failure to train, supervise, and discipline its officers, including repeat offenders such as the Defendants in this case effectively condones, ratifies, and sanctions the kind of misconduct that the Police Officer Defendants committed against Plaintiff in this case. Constitutional violations such as occurred in this case are encouraged and facilitated as a result of the City's practices and *de facto* polices, as alleged above.

195.    The City of Chicago and officials within the Chicago Police Department failed to act to remedy the patterns of abuse described in the preceding paragraphs, despite actual knowledge of the pattern of misconduct. They thereby perpetuated the unlawful practices and ensured that no action would be taken (independent of the judicial process) to remedy Plaintiff's ongoing injuries.

196.    The policies and practices described in the foregoing paragraphs were consciously approved by the City of Chicago policymakers who were deliberately indifferent to the violations of constitutional rights described herein.

197.    The actions of all of the individual Police Officer Defendants were done pursuant to policies and practices of the Chicago Police Department were done pursuant to one or more interrelated *de facto* policies, practices and/or customs of the Defendant City of Chicago which were ratified by policymakers for the City of Chicago with final policymaking authority. These policies and practices included, among others:

g.    conducting physically and psychologically or otherwise illegal or improperly coercive interrogations of suspects and witnesses in order to obtain false statements and wrongful convictions.

h.    manufacturing and fabricating false suspect and witness statements and manipulating and lying to witnesses to influence unreliable and inaccurate testimony.

i.    filing false reports and giving false statements and testimony about interrogations and witness interviews or constructing parts or all of witness statements; suppressing evidence concerning interrogations and/or witness interviews; pursuing and obtaining wrongful prosecutions and false imprisonments on the basis of fabricated witness statements, and otherwise covering up the true nature of those interviews and/or interrogations.

j.    failing to properly train, supervise, discipline, transfer, monitor, counsel and/or otherwise control police officers, particularly those who are repeatedly accused of misconduct, on how to avoid false arrests, wrongful imprisonments, malicious prosecutions, and wrongful convictions, and on the proper manner in which to conduct interrogations of witnesses and arrestees. Among those the city failed to properly train, supervise, discipline, transfer, monitor, counsel and/or otherwise control were the Defendants in this case.

k.    perpetuating, encouraging and condoning the police code of silence, specifically in cases where officers engaged in the violations articulated in paragraphs a-d above, whereby police officers refused to report or otherwise

covered-up instances of police misconduct, and/or fabricated, suppressed and destroyed evidence of which they were aware, despite their obligation under the law and police regulations to report. This code of silence caused police officers either to remain silent or give false and misleading information during official investigations and Grand Jury proceedings in order to protect themselves or fellow officers from discipline, civil liability, or criminal charges. The code of silence also caused police officers to perjure themselves in criminal cases where they and their fellow officers have fabricated evidence or concealed exculpatory evidence.

198. The policies and practices described in this Count and in the factual allegations section of this complaint were maintained and implemented by the City of Chicago with deliberate indifference to Plaintiff's constitutional rights.

199. As a direct and proximate result of the City's actions, Plaintiff suffered injuries, including, but not limited to, emotion distress, as if more fully alleged above.

200. The City of Chicago is therefore liable for the misconduct committed by the Police Officer Defendants.

## COUNT XII
## State Law Claim – Malicious Prosecution

201. Plaintiff repeats and re-alleges all of the paragraphs in this Complaint as if fully set forth herein.

202. All of the individual Defendants caused Plaintiff to be improperly subjected to judicial proceedings for which there was no probable cause. These judicial proceedings were instituted and continued with malice and resulted in the

injury to Plaintiff. All such proceedings were ultimately terminated in Plaintiff's favor and in a manner indicative of innocence.

203.     The Defendants accused Plaintiff of murdering Olegue knowing that he was innocent of the crime. All of the individual defendants fabricated evidence, manipulated witness testimony, and withheld exculpatory evidence. The individual Defendant officers and Prosecutor Defendants knowingly made false statements to the trial prosecutors with the intent of exerting influence to institute and continue judicial proceedings against Plaintiff.

204.     The misconduct described in this Count was undertaken with malice, willfulness and reckless indifference to Plaintiff's rights.

205.     As a direct and proximate result of this misconduct, Plaintiff suffered injuries, including, but not limited to, emotional distress, as is more fully alleged above.

## COUNT XIII
## State Law Claim – Civil Conspiracy

206.     Plaintiff repeats and re-alleges all of the paragraphs in this Complaint as if fully set forth herein.

207.     As described more fully in the preceding paragraphs, the Defendants acting in concert with one another and other co-conspirators, known and unknown, conspired to accomplish an unlawful purpose by unlawful means. In additional, these co-conspirators agreed among themselves to protect one another from liability for depriving Plaintiff of these rights.

208.     In furtherance of the conspiracy, the Defendants committed overt acts

and were otherwise willing participants in joint activity.

209.     The violations of Illinois law described in this complaint, including Defendants' malicious prosecution of Plaintiff and their intentional infliction of emotion distress, were accomplished by Defendants' conspiracy.

210.     The misconduct described in this Count was objectively unreasonable, was undertaken intentionally, and in total disregard of the truth and Plaintiff's clear innocence.

211.     As a direct and proximate result of this misconduct, Plaintiff suffered injuries, including, but not limited to, emotional distress, as is more fully alleged above.

## COUNT XIV
## State Law Claim – Intentional Infliction of Emotional Distress

212.     Plaintiff repeats and re-alleges all of the paragraphs in this Complaint as if fully set forth herein.

213.     The acts and conduct of the individual Defendants as set forth above were extreme and outrageous. The Defendants intended to cause or were in reckless disregard of the probability that their conduct would cause sever, emotional distress to Plaintiff.

214.     The individual Defendants' actions and conduct directly and proximately caused severe emotional distress to Plaintiff, and thereby constituted intentional infliction of emotional distress.

215.     The misconduct described in this Count was undertaken with malice, willfulness and reckless indifference to Plaintiff's rights.

216.     As a direct and proximate result of Defendants' wrongful acts, Plaintiff suffered injuries, including, but not limited to, emotional distress, as is more fully alleged above.

## COUNT XV
## State Law Claim - Willful and Wanton Conduct

217.     Plaintiff repeats and re-alleges all of the paragraphs in this Complaint as if fully set forth herein.

218.     At all times relevant to this complaint the Defendants had a duty to refrain from willful and wanton conduct.

219.     Notwithstanding that duty, these Defendants acted willfully and wantonly through a course of conduct that showed an utter indifference to, or conscious disregard of, Plaintiff's rights.

220.     As a direct and proximate result of Defendants' wrongful acts, Plaintiff suffered injuries, including, but not limited to, emotional distress, as is more fully alleged above.

## COUNT XVI
## State Law Claim – *Respondeat Superior*

221.     Plaintiff repeats and re-alleges all of the paragraphs in this Complaint as if fully set forth herein.

222.     When they committed the acts alleged in this Complaint, the individual Defendant officers were members and agents of the Chicago Police Department, an agency of the City of Chicago, acting at all relevant times within the scope of their employment and under color of law.

223.     Defendant City of Chicago is liable as principal for all torts committed

by its agents.

224.     When the Prosecutor Defendant committed the acts alleged in this Complaint, she was a member of the office of the Cook County State's Attorney, an agency of Cook County, Illinois, acting at all relevant times within the scope of their employment and under color of law.

225.     Defendant Cook County is therefore liable as principal for all torts committed by its agents, Defendant Armbrust.

## COUNT XVII
## State Law Claim – Indemnification

226.     Plaintiff repeats and re-alleges all of the paragraphs in this Complaint as if fully set forth herein.

227.     Illinois law provides that public entities must pay any tort judgment for compensatory damages for which its employees are liable based on upon the employees' misconduct committed within the scope of their employment activities.

228.     The individual Defendant officers are or were employees of the Chicago Police Department, an agency of the City of Chicago, who acted within the scope of their employment in committing the misconduct described herein.

229.     Similarly, Defendant Armbrust was an employee of the Cook County State's Attorney's office, an agency of Cook County, Illinois, who acted within the scope of her employment in committing the misconduct described herein.

**WHEREFORE**, Plaintiff TYRONE REYNA prays this Court enter judgment in his favor and against each Defendant, awarding compensatory damages in an amount in excess of $50,000,000, costs and attorneys' fees against all Defendants,

and punitive damages against each of the individual Defendants in their individual capacities, and for such further and additional relief as this Court may deem appropriate and just.

**JURY DEMAND**

Plaintiff demands a trial by jury.

Respectfully Submitted,

**TYRONE REYNA**

By: /s/Steven A. Greenberg
    *One of Plaintiff's attorneys*

**Steven A. Greenberg**
**Nicholas Burris**
**Greenberg Trial Lawyers**
**53 West Jackson Blvd., Suite 315**
**Chicago, Illinois 60604**
**(312) 879-9500**
**Steve@GreenbergCD.com**